UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

P.E.,

          Plaintiff,

    v.

ANDREW SAUL,

          Defendant.

Case No.  18-cv-07117-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S  MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 21, 28

## I.      INTRODUCTION

Plaintiff P.E.[1] brings this action challenging the final decision of Defendant Andrew Saul,[2] Commissioner of Social Security (the "Commissioner") denying P.E.'s application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §1381, *et seq*.  The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons set forth below, P.E.'s motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further administrative proceedings consistent with this order.[3]

## II.      BACKGROUND

P.E. is a 58-year-old former janitor with a fourth-grade education.  Administrative Record ("AR") at 44, 67, 76.  He alleges disability based on trigeminal neuralgia, hyperlipidemia, seizure disorder, and depression and anxiety.  *Id*.  P.E. alleges an onset day of June 28, 2013.  *Id*.  P.E.

---

[1] Because opinions by the Court are more widely available than other filings and this Order contains potentially sensitive medical information, this Order refers to Plaintiff only by his initials.

[2] Andrew Saul was confirmed as Commissioner while this action was pending and is therefore substituted as the defendant as a matter of law.  *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[3] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

speaks only Spanish.  *Id*. at 71.

### A.   Education and Employment

P.E. was born in Mezcala, Jalisco, Mexico.  AR at 200.  He left school in the fourth grade because of a learning disability.  *Id*. at 530.  He came to the United States in 1975 and moved back and forth between the United States and Mexico until 1999, when he and his family permanently settled in California.  *Id*.  P.E. and his wife M.E. have two children and two grandchildren.  *Id*.  He is pursuing citizenship through naturalization.  *Id*. at 599.

P.E. worked as a janitor from 2004 until 2013, when his contract expired.  *Id*. at 45, 240.  According to P.E., he worked at that job for six to seven years.  *Id.*  He testified that after that, he was "unable to perform at other jobs he was offered."  *Id*. at 528; *see also id*. at 534 ("unable to learn new jobs").  In 2000, he also worked in construction.  *Id*. at 45.

### B.   Medical Background

#### 1.   Trigeminal Neuralgia

P.E. developed trigeminal neuralgia around 1998 and was treated with Tegretol (carbamazepine).  AR at 528.  P.E. was seen by Dr. Jelalian, a neurologist, for his trigeminal neuralgia in 2007.  *Id*. at 402.  Dr. Jelalian prescribed carbamazepine, ordered lab tests after a week on that medication to establish a baseline, and referred P.E. for an MRI to determine whether there was any "structural lesion on the trigeminal nerve."  *Id*. at 403.

In 2010, P.E. saw Dr. Efron to treat his right-side trigeminal neuralgia.  *Id*. at 403.  Dr. Efron described P.E.'s condition as "medically refractory."  *Id*.

P.E. saw Dr. Carlos Enrique Meza, a primary care physician, for a routine physical on March 3, 2013.  *Id.* at 323.  Dr. Meza listed P.E.'s "active problem[s]" as trigeminal neuralgia and hyperlipidemia.  *Id*. at 324. He recorded that P.E. complained of "R trigeminal pain" and opined that he "[c]ould use a tranquilizer."  *Id*.  Dr. Meza noted that P.E. had had trigeminal neuralgia for thirteen years.  *Id*. at 337.  Dr. Meza listed P.E.'s diagnoses as trigeminal neuralgia, depression, and anxiety.  *Id*. at 322.  Dr. Meza had several lab tests performed, all of which came back "normal" on March 4, 2013.  *Id*. at 331.

At an appointment on March 24, 2013, Dr. Meza noted that P.E. was having "breakthrough

pain" despite being on carbamazepine and that he was unable to go to work. *Id*. at 337.  Dr. Meza

started P.E. on nortriptyline for pain and continued P.E. on carbamazepine. *Id*. at 337-338.  He

also prescribed lorazepam for anxiety. *Id*. at 338.  Dr. Meza ordered a lab test to determine P.E.'s

carbamazepine level, which came back within normal range. *Id*. at 342.

On April 4, 2014, Dr. Meza's assistant called P.E. to inform him of the lab results and to

ask whether the carbamazepine was controlling his pain; she spoke with P.E.'s wife, who told her

that P.E.'s pain was "being well controlled." *Id*. at 343.

On April 26, 2013, P.E. began a series of acupuncture treatments to help manage his pain.

*Id*. at 422–26.  P.E. told the acupuncturist, Josef Inderkum, that his pain was "triggered at times

with talking." *Id*. at 426.  At his first visit, P.E. told Inderkum that he had struggled with

trigeminal neuralgia for twelve years. *Id*. at 426.  P.E. also told the acupuncturist that the pain did

not disrupt his sleep but that it did impact his family. *Id*.  P.E. underwent a total of six sessions of

acupuncture. *Id*. at 422.

 On April 28, 2014 2014, Dr. Meza put P.E. on state disability. *Id*. at 352.  In May 2014,

Dr. Meza extended P.E.'s state disability to December 28, 2014. *Id*. at 352-353.

On May 22, 2014, Dr. Meza noted that P.E. was having good results with medication. *Id*.

at 347. Throughout 2014, Dr. Meza consistently noted that P.E. was "alert, well appearing, and in

no distress." *Id*. at 414, 416, 417. On January 7, 2015, Dr. Meza wrote that P.E. was "well-

appearing," "in no distress," and "[r]esponds to present therapy." *Id*. at 386.

At an office visit on May 22, 2015, Dr. Meza noted that P.E. was "[f]rustrated about his

trigeminal neuralgia – states that it affects him psychologically, it makes him depressed[.]  Upset

and unable to carry on his ADL's." *Id*. at 411.  He was oriented but "anxious." *Id*.  Dr. Meza

added "Recommend personal disability" to P.E.'s problem list. *Id*. at 412.

On May 28, 2015, M.E. called Deborah Williams at Kaiser. *Id*. at 410.  She told Williams

that P.E.'s pain was getting worse and that "she can't see him going back to work in his

condition." *Id*.  M.E. told Williams that P.E. was "trying to see if he could be deem[ed]

permanently disabled." *Id*.  Williams asked Dr. Jelalian for next steps; Dr. Jelalian replied that

P.E. had already seen the neurosurgeon and that "he needs to talk with his PCP about disability."

United States District Court
Northern District of California

*Id.* Medical Assistant Gita Swaminathan called M.E., who told Swaminathan that the PCP was "not helping" and was "not writing enough to address disability." *Id.* Dr. Jelalian reiterated that she did not "do disability papers." *Id.* P.E.'s daughter called Williams back and clarified that P.E. was asking to be seen by Dr. Jelalian to determine if there were additional options for his pain, including the possibility of an MRI to see what was going on, as P.E.'s pain was getting worse. *Id.* Dr. Jelalian then ordered an MRI. *Id.*

On June 5, 2015, P.E. underwent an MRI of his brain. *Id.* at 403-404. The MRI revealed a stable lesion on his brain, which the radiologist thought was benign. *Id.*; *see also id.* at 434–35 ("As this lesion appears closely associated with the tip of the basilar artery, a chronic . . . aneurysm or other vascular lesion may be considered."), 465-467 (full results). P.E. underwent a CT test of his brain on June 11, 2015. *Id.* at 402–03. The test revealed a lesion, but the interpreting physician agreed that it was benign. *Id.* at 403.

Dr. Jelalian opined on June 12, 2015 that "CT scan <u>results</u> do not show a reason for his facial pain." *Id.* at 406; *see also* 434 (summary of results). Dr. Jelalian called P.E. and spoke to P.E. and his wife on June 12, 2015. *Id.* at 403. M.E. reported that P.E. was having trouble with his memory and was depressed. *Id.* P.E. told Dr. Jelalian that he was feeling a sharp, persistent, worsening pain which "[o]ccurs more when he is under stress." *Id.* Dr. Jelalian recommended that P.E. consider having surgery, but, according to M.E., he was not interested. *Id.*

Dr. Sharon Ghandi, a neurologist, saw P.E. on June 17, 2015. AR at 402. She referred P.E. to the Kaiser pain clinic. *Id.* She also found that P.E. would be a "[g]ood candidate for microvascular decompression or radiosurgery." *Id.* However, P.E. again declined surgery. *Id.* at 528]

P.E. met with Timothy Moore, M.F.T., on July 9, 2015. *Id.* at 518. Using his wife as a translator, P.E. told Moore that he "does not want to increase medication, does not want surgical options." *Id.*

P.E. saw Dr. Lanny Hsu, a physician with Kaiser's Chronic Pain Management Program, on July 14, 2015. *Id.* at 461. Dr. Hsu's notes describe P.E.'s pain as "sharp, shooting, [and like an] ice pick," occurring "intermittent[ly]" and exacerbated by "stress, <u>anxiety</u>, eating, talking." *Id.* at

4

512 (emphasis in original).   Dr. Hsu told P.E. to stop taking Nortriptyline for a few nights to see how his pain level was affected, and also prescribed a ketamine pain relief gel to be used two to three times a day, as needed, for facial pain.   *Id*. at 518.

In a telephone appointment on July 16, 2015, P.E. reported that he didn't feel much different when he was off Nortriptyline and Dr. Hsu told him to stay off it.   *Id.* at 511.   Dr. Hsu also instructed P.E. to reduce his morning dose of Tegretol (carbamazepine) to see if this reduced its side effects.   *Id*. at 511.

At a phone appointment on July 20, 2015, P.E. told Dr. Hsu that his pain was exacerbated by his mood, stress, and "sleep disruption."   *Id*. at 510.   Dr. Hsu noted that P.E. had an "[u]nclear response to dose reduction in Tegretol aside from possibly mildly worsened pain when he has flares."   *Id*.   P.E. had another telephone appointment with Dr. Hsu on July 23, 2015, this time with a telephonic translator instead of his wife.   *Id*. at 508.   He reported worsening pain along with additional side effects: "feels floppy, loose, does later confirm he feels less tired and less difficulty concentrating."   *Id*.   Dr. Hsu prescribed gabapentin to rotate with, and eventually replace, Tegretol and referred P.E. for opioid titration "if necessary."   *Id*. at 508–509.

On August 4, 2015, Dr. Hsu noted that P.E. was still experiencing "fatigue, body aches, drowsiness," which P.E. attributed to his medication.   *Id*.   P.E. also mentioned that his pain worsened when he was brushing his teeth.   *Id*.   He told Dr. Hsu that the ketamine gel was not helpful because it was difficult to predict when his pain would flare.   *Id*. at 505-506.   Dr. Hsu advised P.E. and his wife "to work on distraction techniques and stress reduction as stress, anxiety, poor sleep, can increase pain."   *Id*. at 506 (emphasis in original).

On August 11, 2015, Dr. Hsu had P.E. start taking baclofen for pain on a trial basis.   *Id*. at 504-505.   On August 17, 2015, P.E. told Dr. Hsu he was "doing great" with baclofen.   *Id*. at 502. Dr. Hsu remarked that P.E.'s "mood sounds better over the phone."   *Id*.   At their appointment on August 24, 2015, Dr. Hsu increased P.E.'s dose of baclofen and noted that P.E. was "[t]olerating it very well compared to prior meds.   However, not sure if much difference in pain although last time he thought maybe he had less severe pain attacks."   *Id*. at 501.   On August 31, 2015, Dr. Hsu noted that P.E. reported he could "do more activities as a result" of being on baclofen.   *Id*. at 500.

1   At their telephone appointment on August 31, 2015, Dr. Hsu wrote that P.E. had been

2   taking a higher dose of baclofen than prescribed and reported that this resulted in decreased

3   frequency of his attacks but had no effect on their intensity. *Id*. at 497–98. Dr. Hsu noted that

4   P.E. was "able to do more activities as a result" but likely could not tolerate a further increase

5   because of the side effects, particularly "sedation." *Id*. at 500.

6   On October 2, 2015, Dr. Hsu noted that P.E. was experiencing "some benefits" from his

7   "self-adjusted" baclofen dose but that P.E. wanted to reduce further the frequency of his pain

8   "attacks." *Id*. at 498. Dr. Hsu raised P.E.'s dose slightly. *Id*.  He noted that P.E. "[s]eem[ed]

9   emotionally and functionally stable and still better than before." *Id*. at 498.

10   P.E. saw M.F.T. Moore on October 19, 2015, when he reported "no change or

11   improvement since starting program. Still very frustrated. Hurts worse when talking or eating."

12   *Id*. at 492.

13   On November 3, 2015, P.E. told Dr. Hsu that he had mixed up his medication and was

14   experiencing dizziness, sweating, and fatigue. *Id*. at 491. P.E. told Dr. Hsu on December 9, 2015

15   that the medication regime was helping with his pain but that he "continue[d] to occasionally have

16   poor energy and cognitive issues." *Id*. at 490. He reported that he had a cough, which made his

17   trigeminal neuralgia pain worse. *Id*. at 485.

18   On May 9, 2016, Dr. Meza noted that P.H. had had a "poor memory for the last few

19   years," which P.E. attributed to his medications, but that his memory did not improve when P.E.

20   discontinued some of his medications. *Id*. at 577.   *Id*. at 577.  P.E. told Dr. Meza that tramadol

21   was no longer effective at a visit on June 23, 2016. *Id*. at 569. Dr. Meza prescribed hydrocodone–

22   acetaminophen (Norco) to treat P.E.'s pain. *Id*. at 570.

23   P.E. was seen by Shruti Datta, M.D., on November 9, 2016, "for evaluation of cognitive

24   concerns." *Id*. at 551. His wife accompanied him to the appointment. *Id*. P.E. answered "yes"

25   when asked whether he was "anxious most of the time and [felt] that is impacting your life." *Id*. at

26   554. Dr. Datta diagnosed P.E. with mild cognitive impairment "likely . . . related to pain,

27   medications, and . . . anxiety [and] severe depression." *Id*. at 558. She referred P.E. to the

28   "psychiatry department for medication management." *Id*.  She ordered blood tests, a sleep test

6

and further neuropsychological testing to address how P.E.'s medications were affecting his cognitive functioning and whether his memory deficits were normal for his age.  *Id*. at 558, 528. She also discussed with P.E. and M.E. techniques for improving his memory and concentration. *Id*. at 563-564.

On November 9, 2016, another CT scan of P.E.'s brain was done.  *Id*. at 553.  Like the 2007 CT scan, it showed a lesion but it appeared to be stable, which "favor[ed] benignity."  *Id*. On December 8, 2016, P.E. underwent another MRI of his brain.  *Id*. at 547-549.  The MRI, like the CT scan, showed a lesion (which radiologist Eamon Kenichi Kato described as "nonspecific heterogeneous ill-defined area of soft tissue") that appeared to be stable and revealed no new abnormalities since the June 2015 MRI.  *Id*. at 549.  The aneurysm was also unchanged.  *Id*.

Dr. Shelly Peery, a psychologist, completed a Spanish-language neuropsychological evaluation of P.E. based on examinations conducted on January 3, 2017 and January 17, 2017, upon the referral of Dr. Datta.  *Id*. at 528-535.  P.E. was accompanied to the appointment by his wife, who provided historical information.  *Id*. at 528.  Summarizing his past treatment, Dr. Peery wrote that P.E. completed a pain management program in September of 2016 and that he declined surgery for his trigeminal neuralgia in 2010.  *Id*. at 528.  She also wrote "[a]fter he was laid off from his job as a janitor at Shell in 2014, he was unable to perform at other jobs he was offered, even those offered by family and friends."  *Id*.  Dr. Peery noted that while P.E. was "independent" with regard to his basic activities of daily living and could drive himself, he usually had someone drive with him because his family was concerned he would get lost.  *Id*.

M.E. told Dr. Peery that P.E. had problems with his memory:

> [T]he patient frequently forgets what she has told him, he forgets to do important tasks, he forgets his medications, and he is unable to complete errands or fill out paperwork.  He accidentally left the electric stove on the day before the present examination.  Medical records also show that he has forgotten some of his appointments.

*Id*.  She found that "[o]n a memory screener, [P.E.'s] performance fell in the range of mild cognitive impairment."  *Id*.

Dr. Peery noted that P.E. experienced disrupted sleep and weight loss, and that because eating triggered his trigeminal neuralgia pain, he ate alone and took small bites.  *Id*. at 529.  She

United States District Court
Northern District of California

7

1    observed this his "[s]enses of smell and taste have also declined since 2000." *Id*. According to

2    Dr. Peery, P.E. reported pain "as great as 10/10 for 3 or more attacks per day; each attack lasts 5-

3    15 minutes before subsiding." *Id*. He also reported walking for between half an hour and an hour

4    "most days." *Id*. Neither of P.E.'s parents and none of his siblings had memory issues. *Id*. When

5    recounting his educational history, P.E. explained that he had a "reading learning disability" as a

6    child and left school after repeating the third and fourth grades because of his learning disability.

7    *Id*. at 530.

8        When explaining her testing methodology, Dr. Peery noted that P.E. "may not have been

9    able to put forth his best effort. Therefore, the present result must be interpreted with caution;

10   while [P.E.'s] true ability is likely greater than his performance during the present evaluation, it is

11   not likely lower." *Id*. at 531. However, Dr. Peery also found that malingering was "unlikely

12   given the multitude of alternative explanations for reduced effort," such as P.E.'s fatigue, pain,

13   "mood disorders," and a "'cry for help' and/or frustration with the evaluation process." *Id*.

14       In Dr. Peery's opinion, P.E.'s general intellectual functioning was "[l]ow average

15   compared to individuals with 4 years of education; moderately impaired compared to high school

16   educated individuals." *Id*. at 532. Specifically, his attention and concentration were average to

17   low average; his verbal functioning was "[m]ostly average"; his perceptual-motor functioning and

18   processing speed was average; and his memory and learning ability was average to high average.

19   *Id*. at 533-534. Dr. Peery again asserted that she did not believe P.E. was putting forth his full

20   effort, particularly with regard to recognition and visual recall tasks. *Id*. Dr. Peery found that

21   P.E.'s executive functioning skills were "[l]ow average or above, except for multitasking and

22   judgment (impaired)." *Id*. at 533.

23       Overall, Dr. Peery concluded:

24            This pattern of performance is not suggestive of a primary
              neurological disorder that results from neuropathy. However,
25            [P.E.'s] functioning is significantly impaired by his depression and
              anxiety, which are very real physiological conditions with known
26            depressive effects on the functioning on the brain. Given his low level
              of functioning, [P.E.] meets criteria for Minor Neurocognitive
27            Disorder due to his depression, anxiety, insomnia, obstructive sleep
              apnea, and chronic pain due to his trigeminal neuralgia.
28

United States District Court
Northern District of California

8

1    *Id*. at 534–35.  Dr. Peery opined that P.E. was at a "moderate risk for suicide" and recommended

2    that he be "monitored regularly." *Id*. at 535.   She also noted that, after being treated for his mood

3    disorder, P.E. should reconsider his opposition to neurosurgery for his trigeminal neuralgia.  *Id*.

4    Nurse Practitioner Mary Cochran Abraham reviewed Dr. Peery's report with P.E. and his wife

5    with the help of a video interpreter.  *Id*. at 541.

6                   **2.   Anxiety, Depression and Cognitive Impairment**

7         In his notes from a March 3, 2013 routine check-up exam, Dr. Meza included anxiety in

8    P.E.'s diagnosis and prescribed Lorazepam to treat it.  *Id*. at 322-324.  On June 12, 2015, P.E.'s

9    wife told Dr. Jelalian that P.E. was depressed.  *Id*. at 403.  She also told a social worker who

10   followed up on June 18, 2015 that P.E. was depressed but that he would not be open to seeing

11   someone for his depression.  *Id*. at 402.  Nonetheless, P.E. was evaluated by a psychologist, Dr.

12   Alberto Matias, Ph.D., on June 2, 2015.  *Id*. at 408.  P.E. reported to Dr. Matias that he had been

13   suffering from anxiety "for a long time."  *Id*.  Dr. Matias wrote that P.E. was experiencing

14   "excessive worry, restlessness, muscle tension, insomnia, restless sleep, and somatic complaints."

15   *Id*.  P.E. reported that carbamazepine and Nortriptyline were "not helping."  *Id*.   Dr. Matias

16   performed a mental status examination.  *Id*. at 408–09.  He found that while P.E.'s mood was

17   "anxious," his affect was appropriate and all other categories were within normal limits.  *Id*.

18   According to Dr. Matias, P.E. was not currently experiencing suicidal or homicidal ideation but he

19   had experienced suicidal ideation about a month before, "triggered by strong pain."  *Id*. at 409.

20   Dr. Matias assigned P.E. a Global Assess of Functioning ("GAF") score of "41-50 serious

21   symptoms."  P.E.'s PHQ-9 score was 22, but Dr. Matias noted that P.E. "appeared less depressed

22   than score may suggest."  *Id*.  Dr. Matias diagnosed P.E. with Adjustment Disorder.  *Id*.

23        On June 6, 2015, P.E. returned to Dr. Matias complaining of stress, depression, and pain.

24   *Id*. at 405.  Dr. Matias found that P.E.'s treatment compliance was within normal limits and noted

25   that P.E. wanted to start working again, but was "afraid he will get fired."  *Id*.  Dr. Matias updated

26   P.E.'s mental status exam to reflect that his mood was "depressed."  *Id*. at 406.  He assigned P.E. a

27   GAF of "51-60 moderate symptoms."  *Id*.

28        P.E. was seen by M.F.T. Moore for a Pain Clinic Psychological Evaluation on July 9,

United States District Court
Northern District of California

1    2015.  *Id*. at 518.  His wife participated in the session at P.E.'s request.  *Id*.  P.E. said that his pain

2    medications (carbamazepine and Nortiptyline)  helped "a little."  *Id*. at 519.  However, his wife

3    reported that the Nortriptyline "really changed" P.E.'s personality and that he had developed

4    "significant problems" with his short-term memory.  *Id*.  Moore noted that P.E.'s main stressor

5    "other than pain and disability" was his financial situation, namely, that he had not worked for two

6    years and "disability and unemployment have run out."  *Id*.  Moore listed P.E.'s diagnosis as

7    adjustment disorder with anxiety and depressed mood.  *Id*.  He noted that P.E.'s PHQ-9 score was

8    23, indicating "severe depressive symptoms," his mood was depressed, and his affect was

9    "blunted but showed some range."  *Id*.  at 520.  He listed P.E.'s GAF Score as 51-60, indicating

10   "moderate symptoms."  *Id*. at 521.

11          P.E. was referred by the Department of Social Services for a disability evaluation by

12   psychologist April Young, who examined P.E. on August 15, 2015.  *Id*. at 473–76.  The exam

13   was conducted in English and P.E. participated with the help of an interpreter.  *Id*. at 473.  Dr.

14   Young's report was based on her own examination as well as review of Dr. Matias's June 2, 2015

15   evaluation (*see id*. at 408-409) and the Adult Function report completed by P.E. (*see id.* at 249-

16   256, discussed below).   In summarizing P.E.'s employment history, Dr. Young noted that P.E.

17   "quit as the new company took over and no longer provided employee benefits."  *Id*. at 474.  She

18   noted that P.E. had been diagnosed with an adjustment disorder.  *Id*.  Dr. Young observed that P.E.

19   was "pleasant and cooperative," and that his mood presented as "euthymic."  *Id*. at 475.

20          Dr. Young conducted a mental status examination and found:

21                 [P.E.] was alert and oriented.  He displayed adequate attention and
                   concentration for conversation.  His memory for immediate, recent
22                 and remote events appeared to be grossly intact in terms of related his
                   personal history.  He was able to recall 3/3 items immediately and 1/3
23                 items after delay. . . .  [P.E.] reported that his mood is "nervous."  His
                   affect was full in range and was appropriate to the setting.  [P.E.'s]
24                 thought process was linear.  No impairment with regard to thought
                   content was noted.   There was no evidence of hallucinations,
25                 delusions or other symptoms suggestive of a thought disorder present
                   during this evaluation.  He denied experiencing suicidal or homicidal
26                 ideation.  However, he stated he has the desire to hit his head against
                   the wall to dislodge whatever is causing his pain.
27
     *Id*. at 475.  She also conducted a test of P.E.'s intellectual functioning, the TONI-3.  *Id*. at 474.
28

United States District Court
Northern District of California

P.E. "earned a deviation quotient of 60 which falls within the < 1 percentile," suggesting "impaired cognitive functioning." *Id*. at 575.  She noted that P.E. described himself as "forgetful." *Id*.  Dr. Young reported that P.E. "denied a history of anxiety prior to experiencing his symptoms." *Id*.  She noted that although P.E. did not have a history of suicide attempts, he reported experiencing "suicidal ideation related to strong pain." *Id*.  Dr. Young's diagnostic impression was "Adjustment Disorder with Mixed Anxiety and Depressed Mood." *Id*. at 476.  She added "[Rule Out] Mood Disorder due to Pain" and "[Rule Out] Cognitive Disorder NOS." *Id*.

Based on her observations, Dr. Young offered the following assessment of P.E.'s abilities:

> [T]he claimant would be able to deal with the public, supervisors, and coworkers in an appropriate manner.
>
> [P.E.'s] ability to understand instructions is adequate.  When confronted with straightforward one- and two-step tasks, the results of the current examination indicate that the claimant's abilities would be moderately impaired.  [P.E.] is unable to perform work activities without special or additional supervision.  The claimant has fair ability to adapt to the usual stress encountered in the work setting.  The claimant is able to be aware of normal hazards in the workplace and react appropriately.
>
> Based on the current evaluation, [P.E.] has adequate ability to manage his supplementary funds independently.

*Id*. at 476.

On October 2, 2015, medical assistant Ileana Del Carmen Alas called P.E. to schedule a follow-up with M.F.T.  Moore and left a message on P.E.'s voicemail.  *Id*. at 499. She called back on October 7, 2015 and spoke with M.E.  *Id*. at 499.  M.E. reported as follows:

> [P.E.] hasn't been doing so well with medication and has been down and depressed. Wife states she's never seen husband so depressed . . . . Wife states her brother had to take him out of the house just to distract him.  Wife explained that every time appointment is booked with Tim [Moore, M.F.T.] husband decides to cancel the day before. He has expressed to her that no one understands how he feels due to the language barrier. . . . She feels that his <u>depression</u> is getting worse with his pain.  She doesn't know if it's the medication side effects.

*Id*. at 497.

At his October 19, 2015 appointment, P.E. reported to M.F.T. Moore that he had

1   experienced "no change or improvement" since starting the pain management program and was

2   "still very frustrated." *Id*. at 493.  Moore noted that  P.E. seemed "somewhat less uncomfortable

3   and less down than the initial visit." *Id*. He found that P.E.'s mental status was overall "normal"

4   but that P.E. presented as "mildly withdrawn and irritated." *Id*.

5          In her January 2017 neuropsychological examination of P.E. (discussed above), Dr. Peery

6   noted that P.E. did not want to see mental health providers who did not speak Spanish. *Id*. at 530.

7   Dr. Peery described P.E. as "a pleasant man who appeared fatigued and depressed.  Affect was flat

8   . . . . He was alert and fully oriented. . . . Thought processes were logical and coherent." *Id*. at

9   531.  Dr. Peery noted that P.E.'s questionnaire responses indicated that he had mild anxiety and

10  severe depression. *Id*. at 532.  She noted that P.E. also expressed passive suicidal ideation. *Id*.

11  Dr. Peery opined that "he meets the diagnostic criteria for Major Depressive Disorder, and he is at

12  moderate risk for suicide," *id*., and that "[P.E.]'s depression and anxiety have worsened despite

13  ongoing psychotherapy." *Id*.  Dr. Peery also found that "[P.E.] is significantly impaired by his

14  depression and anxiety." *Id*. at 534.

15         On March 2, 2017, P.E. and M.E. met with Gwendolyn Moody-Tzannes, M.F.T., to

16  discuss medication management. *Id*. at 679–80. Between December of 2015 and June of 2017,

17  P.E. continued to see Dr. Matias, who consistently described P.E.'s mood as "depressed." *Id*. at

18  635, 641, 655, 661, 665, 669, 674, 683, 688, 700, 708, 723; *but see id.* at 692, 713, 718, 727, 732,

19  737 (recording P.E.'s mood as "expansive"), 742 (recording P.E.'s mood as "anxious").

20         On May 4, 2017, Dr. Matias completed Form N-648 (Medical Certification for Disability

21  Exceptions) (the "USCIS Form") in support of P.E.'s request to be excused from the English

22  language and United States civics and history requirements in connection with his application for

23  United States citizenship. *Id*. at 599-606.  In the form, Dr. Matias listed P.E.'s diagnoses as "Mild

24  Neurocognitive Disorder;" "Major Depressive Disorder;" and "Chronic Pain . . . due to medically

25  Refractory Trigeminal Neuralgia." *Id*. at 602.   He noted that the information in the form "has

26  been collected in the process of providing [P.E.] Mental Health Services for Depression/Anxiety

27  symptoms only." *Id*.

28         The form asked for a "basic description" of the disability or impairment, "for example,

United States District Court
Northern District of California

12

1    Intellectual Disability (severe) is a genetic disorder that causes lifelong intellectual disability,

2    developmental delays, and other problems." *Id*.  In response, Dr. Matias provided descriptions of

3    "Mild Neurocognitive Disorder" and "Major Depressive Disorder." *Id*.  He described the

4    diagnosis of Mild Neurocognitive Disorder as:

5                    . . . a marked decline in cognitive functioning and significant
                 impairment in cognitive performance.  Patients may report symptoms
6                of memory impairment, decline in the ability to perform everyday
                 activities, though still able to perform these activities without
7                assistance, and difficulties with language, perceptual-motor and
                 social skills.

8

9    *Id.* He described Major Depressive Order as:

10                   . . .depressed mood, diminished interest or pleasure in activities,
                 decrease or increase in appetite, insomnia or hypersomnia,
11               psychomotor retardation, fatigue, tiredness, loss of energy, feelings of
                 worthlessness, inappropriate guilt, inability to think or concentrate,
12               memory problems,  indecisiveness and recurrent thoughts of death.

13   *Id*.

14
          Dr. Matias stated in the form that he had been treating P.E. for one year and eleven
15
     months, first seeing P.E. on June 2, 2015 and seeing him most recently May 4, 2017, the date
16
     when he completed the form.  *Id*.  Dr. Matias stated that he expected P.E.'s impairments to last 12
17
     months or more.  *Id*. at 603.
18
          The USCIS Form asked for the "cause of the applicant's medical disability," to which Dr.
19
     Matias responded, "[l]ikely chonic pain (Refractory Trigeminal Neuralgia) triggered
20
     mood/cognitive dysfunction.  Medications' side effects used to treat condition may also exacerbate
21
     reported mood/cognitive symptoms." *Id.* at 603.  Dr. Matias stated that "[m]ood and cognitive
22
     impairments are in the way of applicant acquiring new knowledge (like English as second
23
     language and US history/civics.)"  *Id*. at 604.
24
          C.    **Opinions of State Agency Consultants**
25
          State agency consultant C. Eskander, M.D., reviewed P.E.'s medical records on August 6,
26
     2015, in connection with P.E.'s initial application for disability benefits.  *Id*. at 74–75.  Dr.
27
     Eskander opined that P.E. had no exertional, postural, manipulative, visual, or communicative

28

United States District Court
Northern District of California

13

limitations.  *Id*. at 74.  However, he found that P.E. had environmental limitations and should avoid concentrated exposure to extreme cold, extreme heat, noise, vibrations, and hazards.  *Id*. at 74–75.  Dr. Eskander found that P.E. could actively perform his past relevant work as a janitor.  *Id*. at 46.

On September 11, 2015, state agency reviewer Mack Stephenson, PhD, reviewed P.E.'s records and found that P.E.'s mental impairment was non-severe and that there was "insufficient evidence to substantiate the presence of a disorder." *Id.* at 73.  On February 5, 2016, Pamela Hawkins, PhD, reached the same conclusion based on her review of the record.  *Id*. at 85.  However, state agency consultant M. Acinas, M.D., agreed with the findings of Dr. Eskander based on review of the record on February 1, 2016.  *Id*. at 87.

## D.    Adult Function Report

On July 23, 2015, P.E. filled out a function report with the help of his non-attorney representative.  *Id*. at 249–57.  P.E. reported that he lived in a house with his family.  *Id*. at 249.  He wrote that his memory problems, concentration problems, right jaw pain, anxiety, and depression limited his ability to work.  *Id*.  He wrote that he isolated himself, experienced loss of interest in doing things, that "too many questions confuse[d] [him]," that he was "unable to maintain any type of schedule" and lost his temper easily.  *Id*.  He described his daily routine as follows:

> Wake up at 8am.  Have breakfast, take care of personal hygiene.  Go out for walks per my doctor's orders.  If I am having a good [day] I get on exercise bike, watch T.V., go tend yard, go out for walk again, watch T.V., have dinner.  go to bed @ 10[pm].

*Id*. at 250.  He did not take care of any children or pets.  *Id*.  He also wrote that his illness affected his sleep because he would wake up either from the pain or from a racing mind.  *Id*.

P.E. checked boxes indicating that, while he did not need special reminders to tend to his personal care, he did need to be reminded to take his medication, and his wife ordered his medications for him.  *Id*. at 251.  He wrote that his wife also prepared his meals and did all of the house cleaning, as she had since they'd married.  *Id*.  He stated that he tended to his small yard for twenty minutes per day when he felt "up to it."  *Id*. at 252.  P.E. reported that he went outside

14

"daily" and got around by walking, driving or riding in a car, or riding his bicycle. *Id*. He stated he could go out alone but needed someone with him to help with directions on long drives because otherwise he got confused. *Id*. His wife did "all the shopping," though P.E. accompanied her. He wrote that he went to the grocery store and the hardware store but that he "end[ed] up buying the wrong things." *Id*.

According to P.E., his only hobby was walking, which he undertook "daily – all day a couple of times." *Id*. at 253. He did not think his activities had changed since the onset of his allegedly disabling conditions, although he did state that he walked when he was anxious. *Id*. Socially, he visited a neighbor "almost daily" and went to church on Sunday. *Id*. He indicated that he needed to be reminded to go places, such as his doctor appointments. *Id*. His wife accompanied him everywhere except on his daily walks. *Id*. When asked whether he had problems getting along with others, P.E. answered that he did and added "sometimes people get on my nerves." *Id*. at 254. He wrote that he used to be "the 'joker' of the parties," but that "now [he] only attend[ed] family events." *Id*.

P.E. did not check any of the boxes denoting limitations in his abilities. *Id*. He reported having no problems with walking and that he could walk around the block several times if he was not in pain. *Id*. He wrote that the longest he could pay attention was one hour, which was how long it took him to complete the form. *Id*. He indicated that he had trouble finishing things, especially conversations, reading, and watching sports. *Id*. In addition, P.E. wrote that he could not follow written instructions and needed verbal instructions to be repeated. *Id*. When asked about his ability to get along with authority figures, P.E. wrote that he "ha[d] no need to deal with them." *Id.* at 255. He stated that he had not been fired or laid off from a job as a result of trouble getting along with others. *Id*. He stated that he "become[s] anxious" in response to stress and that he does not handle changes in his routine well because he "gets nervous." *Id*. Finally, P.E. listed Tegretol as his only medication, which he reported caused him to suffer side effects of fatigue and memory problems. *Id*. at 256.

### E.    Seizure Questionnaire

While P.E. included a seizure disorder as one of his disabling conditions, he wrote on July

1    23, 2015 that he had not had a seizure in fifteen years.  *Id*. at 245–47.

2        **F.    Third Party Function Report**

3        P.E.'s wife, M.E., completed a third-party function report with the help of P.E.'s non-

4    attorney representative.  *Id*. at 259–66.  She wrote that she spent "usually all day [with P.E.]"

5    because he sometimes gets confused.  *Id*. at 259.  M.E. stated that P.E. "loses his temper – has no

6    patience – [e]specially when the pain hits him," and that he "isolates in the house" and gets

7    anxious and depressed.  *Id*.  She stated that P.E. has good days "[o]nce in a while" but "you never

8    know when therefore no guarantee he would make it to work."  *Id*.  M.E. wrote that P.E. used to

9    be social and independent but now needs her to be with her at all times, including during doctor

10   appointments.  *Id*. at 260.  She wrote that his sleep was disturbed and the couple was no longer

11   physically intimate.  *Id*.  M.E. had to remind her husband to take his medication and go to his

12   appointments.  *Id*. at 261.  She reported that he only performed about twenty minutes' worth of

13   chores "if he feels up to it," and he did not complete those tasks.  *Id*.

14       According to M.E., while she and P.E. sometimes went shopping together, she could not

15   send P.E. grocery shopping alone because he often purchased the wrong items.  *Id*. at 262.  She

16   reported that she handled the family finances.  *Id*. at 262–63.  Since the onset of his illness, M.E.

17   noted, P.E. had begun to take long walks around the neighborhood.  *Id*. at 263.  While P.E. still

18   attended church on Sundays, he needed M.E. to accompany him.  *Id*.  He no longer enjoyed social

19   gatherings and was irritated by others when he was in pain.  *Id*. at 264.

20       M.E. checked boxes indicating that P.E.'s illness limited his ability to lift, his memory and

21   concentration, and his ability to complete tasks and follow instructions.  *Id*.  She added: "No heavy

22   lifting.  Gets frustrated following directions."  *Id*.  She did not think her husband could follow

23   written instructions and would need spoken instructions to be repeated and to be "simple."  *Id*.

24   M.E. opined that P.E.'s ability to pay attention depended on how much pain he was in.  *Id*.

25       **G.    Summary of Administrative Proceedings**

26       P.E. filed his initial application for benefits on May 3, 2015.  AR at 78.  The application

27   was denied on September 14, 2015.  *Id*. at 93.  He requested reconsideration on November 23,

28   2015.  *Id*. at 99.  Upon reconsideration, the application was denied again on February 5, 2016.  *Id*.

United States District Court
Northern District of California

16

1    at 100.  On April 18, 2016, P.E. requested a hearing.  *Id*. at 107.  Although the request was not

2    filed timely, *id*. at 109, the untimeliness was excused based on a showing of good cause and the

3    request was granted on June 1, 2016.  *Id*. at 112–113, 118.

4        **H.    The Administrative Hearing**

5        A hearing was held on June 30, 2017, in Oakland, California.  AR at 39.  The

6    Administrative Law Judge ("ALJ"), Kevin Gill, heard testimony from P.E, his wife M.E., and

7    Vocational Expert ("VE") Susan Allison.  *Id*.  P.E. was represented by a non-attorney and was

8    assisted by an interpreter.  *Id*.

9        In response to the ALJ's questions, P.E. testified that he had a driver's license and drove

10   "[a]s necessary."  *Id*. at 44.  He testified that he had attended school through the fourth grade and

11   did not have any other education or vocational training.  *Id*.  P.E. told the ALJ that the last time he

12   was employed, he worked as a janitor at the Shell refinery in Martinez, California, a position he

13   held for six or seven years.  *Id*.  He testified that he also worked briefly in construction.  *Id*. at 45–

14   46.  When asked why he stopped working, P.E. pointed to the right side of his face and replied:

15   "Because of the sickness that I have, you know, that it won't let me, and sometimes I get

16   depressed."  *Id*.  The ALJ asked what sickness P.E. was referring to; he replied: "It's a jabbing

17   pain that I get here, right side of my face and it's very strong."  He testified that he experienced the

18   pain "many times a day," that he was in pain "most of the day," and that the flares were more

19   frequent when he was "stressed out."  *Id*. at 46–47.  He testified that he worked with the pain for a

20   while but stopped working when the pain got worse.  *Id*.  P.E. testified that he helped his wife with

21   household chores only when he did not have "the jabbing pain."  *Id*. at 47- 48.  The ALJ also

22   asked P.E. how his depression affected him.  *Id.* at 47.  P.E. testified that it "lower[ed] all of [his]

23   energy."  *Id*. at 47.

24       P.E. was then questioned by his representative, who asked about his depression.  *Id*. at 49.

25   P.E. testified that his depression was bad enough that he thought about suicide when his pain was

26   "really strong."  *Id*.  He testified that he was seeing a psychologist, Dr. Matias, but could not

27   remember when he started seeing Dr. Matias.  *Id*. at 49–50.  When his representative asked

28   whether he thought he could perform "a simple job," P.E. replied that he did not think he could

17

because of his struggles with his memory. *Id*. at 50. He also testified that he had trouble concentrating and that when he was in pain, he could not "think of anything else." *Id*. at 50-51. He testified that he needed to be reminded by his wife to take his medication and also needed her help handling his medical appointments. *Id*. at 51. P.E. also reported that he suffered from anxiety. *Id*.

P.E. testified that on an ordinary day, he woke up at seven or eight in the morning depending on what time he went to sleep, which was usually ten p.m. *Id*. at 52. He went for walks and did some yard work. *Id*. He did not read in either English or Spanish because of the pain and because reading made his eyes tired. *Id*. He testified that because of his problems with reading and with his memory, P.E. had his doctor write a letter to help him become a U.S. citizen. *Id*. at 52. He testified that medication helped with the pain and that he increased his dosage as the pain increased. *Id*. at 53.

The representative next questioned P.E. about his daily activities. *Id*. P.E. testified that he mowed the lawn twice a month, tended the roses and pulled weeds in his yard. *Id*. He said he was able to go out by himself to go to the store or complete chores. *Id*. He testified that he had tried to look for work but had to stop as his symptoms worsened. *Id*.

Next, P.E.'s wife, M.E., testified. *Id*. She told the ALJ that she was around her husband "24/7" to keep an "eagle eye" on him. *Id*. In response to questions from P.E.'s representative, M.E. told the ALJ about the changes she'd seen in her husband in recent years:

> He has changed so much . . . . Now it's like he'll be at the house, or just walk around the block. People know him. They might think he's homeless if they don't know him because he doesn't like being around people . . . . We don't have dinner together . . . . And if we go places that it's crowded, I have to keep an eye on him.

*Id* at 55–56. She estimated that P.E. had lost thirty pounds, testifying that eating was difficult because it triggered P.E.'s face pain. *Id*. at 56–57. When asked whether P.E. had trouble getting along with others, M.E. testified that P.E. was "friendly" but that he "trie[d] to avoid people" because "once he ha[d] the pain he ha[d] to leave because he [could not] talk." *Id*. at 57. She testified that he would "sit . . . for hours by himself in the yard." *Id*. M.E. further testified about P.E.'s problems with his memory. *Id*. at 57-59. She testified that when she told P.E. things he

18

1    forgot them and that when he went places he later forgot he had been there.  *Id*. at 57-58.   M.E.

2    testified that she had to watch him at almost all times and go to all of his doctor appointments.  *Id*.

3    at 59.  She said that while doctors had told them that P.E.'s memory problems were related to his

4    medications, numerous changes in his medications had had no impact on P.E.'s memory.  *Id.*

5          Next, the ALJ questioned the VE.  *Id*. at 60.  She testified that P.E.'s past work as a janitor

6    constituted "heavy exertional work, performed at medium, unskilled, SVP of 2."  *Id*. at 61.  The

7    ALJ offered the following hypothetical:

8          [A]ssume a hypothetical of the claimant's age and education and with
             the past job that you described.  Further assume this individual is
9          limited to lifting and carrying 50 pounds occasionally, 25 pounds
             frequently.
10
           Sit, stand, walk six hours in an eight hour day.  This individual is
11         limited to reading nothing finer than ordinary newsprint or book print.
             This individual is limited to occasional exposure to unprotected
12         heights.

13         Only occasional exposure to extreme cold or extreme heat.  This
             individual is limited to only occasional vibration.  This individual is
14         limited to no more than loud noise.  This individual should also avoid
             concentrated exposure to hazards including dangerous, heavy
15         machinery and open heat sources.

16         This individual is further limited to performing simple, routine tasks,
             and limited to simple work related decisions.
17

18   *Id*.  The VE testified that such a person could perform P.E.'s past work as well as work as a

19   cleaner, a light unskilled job with an SVP of 2 and 387,000 jobs in the national economy, a

20   hospital cleaner, a medium unskilled job with an SVP of 2 and 387,000 jobs in the national

21   economy, a hand packager, a medium unskilled job with an SVP of 2 and approximately 170,00

22   positions nationally, and a kitchen helper, a medium unskilled job with an SVP of 2 and

23   approximately 200,00 positions nationally.  *Id*. at 62.

24         The ALJ offered a second hypothetical:

25         [C]onsider the same person from hypothetical number one but this
             person is further limited to understanding simple oral instructions, and
26         to communicating simple information.  Can this hypothetical
             individual perform any of the jobs you just described, or any other
27         work?

28   *Id*.  The VE replied that such a person could perform all of the jobs she described in response to

the first hypothetical and that such an individual could also perform P.E.'s past work as he performed it but "not as the DOT." *Id*. at 63.

Finally, the ALJ gave the VE a third hypothetical: "[c]onsider the same person from hypothetical number two, but in addition to normal breaks, this person's going to be off task 15 percent of the time in an eight hour day. Can this hypothetical individual perform any work?" *Id*. The VE testified that such a person "would not be able to sustain employment in the open labor market." *Id*.

I. **Framework for Determining Disability**

1. **Five-Step Analysis**

When a claimant alleges a disability and applies to receive Social Security benefits, the ALJ evaluates the claim using a sequential five step process. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determines whether the applicant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Substantial gainful activity is "work activity that involves doing significant physical or mental activities . . . that the claimant does for pay or profit." 20 C.F.R. § 220.141(a)–(b). If the claimant is engaging in such activities, the claimant is not disabled; if not, the evaluation continues at step two.

At step two, the ALJ considers whether the claimant has a severe and medically determinable impairment or combination of impairments. An impairment or combination of impairments is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not suffer from a severe impairment, the claimant is not disabled; if the claimant does have a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing"). 20 C.F.R. § 404.1520(d); *see also* 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's alleged impairment meets one of the entries in the Listing, the claimant is disabled. If not, the ALJ moves to step four.

At step four, the ALJ assesses the claimant's residual functional capacity, or RFC, to assess whether the claimant can perform past relevant work. 20 C.F.R. § 404.1520(e). The RCF

United States District Court
Northern District of California

is a determination of "the most [the claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ considers past relevant work to be "work that [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how do it." 20 C.F.R. § 404.1560(b)(1). If the claimant is able to perform past relevant work, the claimant is not disabled; if the claimant is not able to perform such past relevant work, the ALJ continues to step five.

At the fifth and final step, the burden shifts from the claimant to the Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant is disabled and entitled to benefits. 20 C.F.R. § 404.1520(g)(1).

### 2. Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a. First, the Commissioner must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to the following functional areas: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself. 20 C.F.R. § 404.1520a(b)(2), (c)(3). Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether severity meets or equals the severity of a mental impairment listed in Appendix 1. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520a(a)(4)(iii). Otherwise, the evaluation proceeds to step four of the general disability inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

21

presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Therefore, any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." *Id*. at 12.00(A)(2)(b). A claimant has a "marked" limitation if the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . ." Social Security Ruling 96-8p, 1996 WL 374184, at *4.

## J.     The ALJ's Decision

In a written decision dated October 6, 2017, the ALJ found P.E. not disabled. AR at 21. First, the ALJ found that P.E. met the insured requirements through December 31, 2018 and therefore could receive benefits so long as he demonstrated that he was disabled on or before that date. *Id*. at 23. At step one, the ALJ found that P.E. had not engaged in substantial gainful employment since his alleged onset date, June 28, 2013. *Id*. At step two, the ALJ found that

P.E.'s depression and trigeminal neuralgia were severe medically determinable impairments. *Id.* He found that P.E.'s hyperlipidemia and seizure disorder were not severe. *Id.*

At step three, the ALJ addressed whether P.E.'s impairments met a listing. *Id.* at 24.  In evaluating P.E.'s impairments under the "paragraph B" criteria, the ALJ found that P.E. had moderate impairments in three of the four functional categories: understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting and managing himself. *Id.* He found that P.E. had no limitations in interacting with others. *Id.*  In support of his finding that P.E. had moderate limitations in understanding, remembering, or applying information, the ALJ pointed generally to "the weight of the record." *Id.*  The ALJ did not credit M.E.'s testimony about the severity of P.E.'s memory problems, finding that P.E. "appeared to have good recent and distant memory as he testified at the hearing." *Id.*  The AJL also found that none of P.E.'s treating physicians "has had any concerns " about whether P.E. "can understand medical advice or treatment options," and that "Dr. Peery's opinion regarding the claimant's memory supports this finding." *Id.*

In finding that P.E. had no limitations in interacting with others, the ALJ noted that "[t]he evidence, discussed in more detail elsewhere in this decision, shows that the claimant has interacted with health care providers, that he lives with other people, [and] that he regularly attends church." *Id.*  Overall, he opined that there was not enough evidence in the record to support limitations in this area. *Id.*

In finding that P.E. had moderate limitations in concentrating, persisting, or maintaining pace, the ALJ stated that he took into account P.E.'s testimony while noting that "his treating medical providers have found his thought processes to be within normal limits." *Id.*  Likewise, in finding that P.E. had moderate limitations in adapting or managing himself, the ALJ stated that he took into account P.E.'s testimony while again noting that P.E.'s medical providers had found his thought processes to be within normal limits. *Id.*

The ALJ further found that P.E. did not meet the "paragraph C" criteria, "which require, among other things, a mental disorder that is 'serious and persistent' and evidence of marginal adjustment." *Id.*

1     At step four, the ALJ found that P.E. had the following RFC:

2         [T]he claimant has the residual functional capacity to perform
3         medium work as defined in 20 CFR 404.1567(c) except he can lift
          and/or carry fifty pounds occasionally and twenty-five pounds
3         frequently; he can sit for six hours, stand for six hours, and walk for
          six hours; he can push and/or pull as much as he can lift and/or carry;
4         he is limited to reading ordinary newspaper or book print; he can work
          at unprotected heights occasionally; he can work in extreme cold or
5         heat occasionally; he can work in vibration occasionally; he can work
          in loud noise occasionally; he must avoid concentrated exposure to
6         hazards including dangerous heavy machinery and open heat sources.
          He is limited to performing simple, routine tasks, and to making
7         simple work-related decisions.

8

9     *Id.* at 25.

10    In forming this RFC, the ALJ found that P.E.'s medically determinable impairments could

11    reasonably cause his alleged symptoms but that P.E.'s "statements concerning the intensity,

12    persistence, and limiting effects of these symptoms[were] not entirely consistent with the medical

13    evidence and other evidence in the record."  *Id.* at 27.  In particular, the ALJ noted that P.E. had a

14    long history of anxiety that predated his alleged onset date and but that he did not seek mental

15    health care until mid-2015 and further finding that "all mental health care ha[d] been

16    conservative."  *Id.* at 27.  In support of his conclusion that treatment of P.E.'s anxiety and

17    depression was conservative, the ALJ noted that P.E.'s record did not reflect any "imminent

18    suicidal ideation" or psychiatric confinement.  *Id.*  He also found that P.E.'s "thought process,

19    thought content, attention, concentration, memory, fund of knowledge, impulse control, insight

20    and judgment, were noted to be within normal limits when he sought mental health care in 2015."

21    *Id.*

22    Similarly, the ALJ found that P.E.'s trigeminal neuralgia was longstanding but was only

23    intermittent and had been "conservatively treated."  *Id.*   The ALJ rejected P.E.'s testimony that

24    his pain lasted most of the day, finding instead that the medical record showed it was intermittent;

25    he found that P.E.'s acupuncture treatment "seemed effective" and noted that P.E. took medication

26    for his condition "with good results," according to physicians' notes from May 2014 and January

27    2015.  *Id.* at 27-28.  The ALJ acknowledged that P.E.'s complaints of pain increased in 2015 but

28    noted that the findings of the MRI performed in 2015 were unchanged as compared to his 2007

1   MRI, and that a head CT scan in 2015 showed "consistent findings." *Id*. at 28.   He also pointed to

2   a follow-up CT scan in November 2016 and MRI in December 2016 that showed no significant

3   change. *Id*.  The ALJ also pointed out that although P.E.'s doctors suggested surgery P.E.

4   declined to undergo surgery. *Id*.  In addition, he described M.E.'s communications with treatment

5   providers during this period related to her belief that P.E. was unable to work and seeking

6   assistance with P.E.'s application for disability. *Id*.  The ALJ specifically found that P.E.'s

7   testimony that his pain lasted "most of the day" was not credible, finding that the medical record

8   showed that his pain was, instead, "intermittent." *Id*. at 27.

9          The ALJ gave "limited weight" to M.E.'s opinions as expressed in her third-party function

10   report "because she is not a medical doctor and is not familiar with the rules applicable to the

11   Social Security Administration's disability programs,"  and because her opinions are in large part

12   duplicative of the claimant's own allegations, which are not entirely consistent with the medical

13   evidence of record." *Id*. at 29.

14          In explaining how he weighed the medical opinion evidence, the ALJ wrote that he gave

15   "limited weight" to the opinions of P.E.'s treating psychiatrist, Dr. Matias, expressed in the USCIS

16   Form "because they are not supported with an explanation and are not supported by or consistent

17   with relevant evidence." *Id*. (citing AR 604).    The ALJ further noted that Dr. Matias's opinions

18   in the USCIS Form "appear to have been prepared for submission to immigration authorities, with

19   different metrics applicable for determining whether a cognitive impairment exists." *Id.*

20          The ALJ gave "significant weight" to the opinion of Dr. Peery, who examined P.E. on

21   January 31, 2017 and conducted testing in Spanish, because the opinion was "supported by

22   explanations and with relevant evidence, and [is] consistent with and supported by the record as a

23   whole." *Id*.  He also gave "great weight" the opinions of state agency medical reviewers Dr.

24   Eskander and Dr. Acinas "because [their opinions] are consisted with and supported by the record

25   as a whole" and because the two physicians had experience with Social Security disability

26   determinations. *Id*. at 30.   On the other hand, the ALJ gave "little weight" to the opinions of state

27   reviewing psychiatrists Dr. Stephenson and Dr. Hawkins, finding that their opinions were  not

28   consistent with the entire record and noting that they did not have the opportunity to review the

United States District Court
Northern District of California

1    evidence submitted at the hearing level, having conducted their review in connection with the

2    initial denial of P.E.'s application for disability benefits.  *Id*.

3           Finally, the ALJ explained how he weighed the opinions of Dr. Young, who examined P.E.

4    on August 15, 2015.  *Id*.  He gave "great weight" to most of her opinion, but "little weight" to her

5    opinion that P.E. was unable to work without special supervision because "this part of the opinion

6    is not explained and does not tie back to any of the findings of the mental status exam."  *Id*.

7           The ALJ also found support for his RFC determination based on P.E.'s testimony that he

8    continued to work after his conditions were diagnosed and that he left his job as a janitor for

9    reasons unrelated to his impairments,  and based on evidence that P.E.'s conditions "have been

10   treated conservatively."  *Id*. at 30.

11          At step five, the ALJ found that P.E. was capable of returning to his past work as a janitor.

12   *Id*. at 31.  In addition to his past relevant work, the ALJ found that P.E. could work at one of the

13   jobs that the VE identified at the hearing, all of which were unskilled and did not require fluency

14   in spoken or written English: a cleaner, a hospital cleaner, a hand packager, or a kitchen helper.

15   *Id*. at 31–32. Accordingly, the ALJ found that P.E. was not disabled.  *Id*. at 32.

16   **K.    Plaintiff's Contentions**

17          P.E. contends the ALJ erred in numerous respects.  First, P.E. argues the ALJ improperly

18   weighed the medical opinion evidence, failing to provide sufficient reasons supported by

19   substantial evidence for giving little weight to the opinions of Dr. Matias, who treated P.E., while

20   giving "great weight" to the opinions of state agency doctors who only reviewed the record; and

21   by failing to take into account findings by Dr. Peery about the severity of his limitations even as

22   the ALJ purported to give her opinion "significant weight."

23          Second, P.E. argues that the ALJ erred in assessing P.E.'s credibility because he failed to

24   provide "specific, clear and convincing reasons" for the rejecting P.E. testimony about his

25   symptoms.  In particular, P.E. contends the ALJ selectively relied on information in the record that

26   suggests his condition is controlled while ignoring medical evidence that pointed to the opposite

27   conclusion.

28          Third, P.E. argues that the ALJ erred by giving "limited weight" to the statements of M.E.

United States District Court
Northern District of California

1    in the Third Party Function Report.  To the extent the ALJ relied on the fact that M.E. is not a

2    "medical doctor," P.E. argues that this is not relevant because M.E. was offering lay testimony.

3    He further contends the ALJ was incorrect in concluding that M.E.'s statements about P.E.'s

4    symptoms was duplicative of P.E.'s testimony and therefore could be rejected on the same

5    grounds the ALJ rejected P.E.'s symptom testimony.  Finally, P.E. argues that the ALJ erred by

6    failing to address at all the testimony that M.E. offered at the administrative hearing.

7           Fourth, P.E. argues that the ALJ's RFC is not supported substantial evidence because it

8    does not reflect his limitations associated with anxiety and chronic pain, his limited ability to read,

9    write and speak English and his need for additional supervision at work.  According to P.E., this

10   error is not harmless as it is unlikely that he would be able to perform his past work with an RFC

11   that included additional supervision.  Likewise, he argues that he probably would not be able to

12   perform the other jobs listed by the VE with an RFC that accurately reflected his non-exertional

13   limitations.

14          Finally, P.E. argues that the ALJ erred by posing a hypothetical to the VE that did not

15   reflect the opinions of Dr. Matias and Dr. Young with respect to his limitations.

16   III.    ANALYSIS

17       A.    Legal Standard Governing Review of the Commissioner's Decisions

18          District courts have jurisdiction to review the final decisions of the Commissioner and may

19   affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

20   hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).  "This court may set aside a denial

21   of Social Security disability insurance benefits when the [Commissioner's] findings are based on

22   legal error or are not supported by substantial evidence in the record as a whole."  *Desrosiers v.*

23   *Sec'y of Health & Human Servs.*, 846 F.2d 573, 575–76 (9th Cir. 1988).  Substantial evidence is

24   "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is

25   based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "'Substantial

26   evidence' means more than a mere scintilla," *id.*, but "less than preponderance."  *Desrosiers*, 846

27   F.2d at 576.  Even if the Commissioner's findings are supported by substantial evidence, the

28   decision should be set aside if proper legal standards were not applied when weighing the

United States District Court
Northern District of California

27

1    evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399

2    F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider both the

3    evidence that supports and the evidence that detracts from the Commissioner's conclusion.

4    *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995

5    (9th Cir. 1985)).

6    **B.     Whether the ALJ Erred in Weighing the Medical Evidence**

7    **1.  Legal Standards Governing Weight of Medical Opinions**

8         "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

9    who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

10   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

11   physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996).  The

12   Ninth Circuit "afford[s] greater weight to a treating physician's opinion because 'he is employed

13   to cure and has a greater opportunity to know and observe the patient as an

14   individual.'" *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v.*

15   *Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).  For claims filed before March 27, 2017, as is the

16   case here, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight'

17   so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic

18   techniques and is not inconsistent with the other substantial evidence in [the claimant's] case

19   record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. §

20   404.1527(c)(2)).[4]  The Commissioner must provide clear and convincing reasons for rejecting the

21   uncontradicted opinion of a treating or examining physician.  *Lester v. Chater*, 81 F.3d at 830-31.

22   "[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be

23   rejected for specific and legitimate reasons that are supported by substantial evidence in the

24   record." *Id.*

25        "Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence

26

27   [4] The regulations regarding evaluation of medical evidence have been amended for claims filed
     after March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence
     ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also*
28   20 C.F.R. §§ 404.1520c (a), 416.920c(a).

United States District Court
Northern District of California

28

when they are supported by other evidence in the record and are consistent with it." *Morgan*, 169 F.3d at 600 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id*. at 600–01 (quoting *Magallanes*, 881 F.2d at 750 (9th Cir. 1989)).

## 2. The ALJ Did Not Give Specific and Legitimate Reasons to Discount the Opinions of Dr. Matias Stated in the USCIS Form

As discussed above, Dr. Matias listed three diagnoses on the USCIS Form, "Mild Neurocognitive Disorder;" "Major Depressive Disorder;" and "Chronic Pain . . . due to medically Refractory Trigeminal Neuralgia," and opined that they "are in the way of applicant acquiring new knowledge (like English as second language and U.S. history/civics.")." AR at 602. The ALJ gave "limited weight" to Dr. Matias's opinions, finding that they were "not supported with an explanation and are not supported by or consistent with relevant evidence." *Id*. at 29 (citing AR 604). The ALJ further noted that Dr. Matias's opinions in the USCIS Form "appear to have been prepared for submission to immigration authorities, with different metrics applicable for determining whether a cognitive impairment exists." The Court finds that these are not specific and legitimate reasons supported by substantial evidence for discounting Dr. Matias's opinions.

First, the ALJ's finding that Dr. Matias's opinion is not supported by an explanation is not a legitimate reason for discounting Dr. Matias's opinions. The main opinion Dr. Matias offered in the USCIS Form was that P.E. is impaired with respect to his ability to acquire new knowledge, which is directly related to Dr. Matias's diagnoses of Major Depressive Disorder and Mild Neurocognitive Order. As Dr. Matias stated on the USCIS Form, P.E.'s diagnoses are characterized by, *inter alia*, "memory impairment," "decline in the ability to perform everyday activities," "difficulties with language skills," "inability to think or concentrate," "and "memory problems." *Id*. Further, Dr. Matias explained the source of P.E.'s mood disorder, namely, his chronic pain. *Id*. The USCIS Form also makes clear that Dr. Matias's opinions are based on almost two years of treating P.E. and the results of neuropsychological testing conducted by Dr. Peery (to which the ALJ gave "great weight"). It is not clear what further "explanation" the ALJ

1    was seeking and the absence of "explanation" is not a sufficient reason to discount Dr. Matias's

2    opinion.

3          Second, the ALJ's generic statement that Dr. Matias's opinion was inconsistent with the

4    medical record is insufficiently specific to meet the ALJ's burden.  When an ALJ rejects a treating

5    provider's opinion, he must "set[] out a detailed and thorough summary of the facts and

6    conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Magallanes*,

7    881 F.2d at 751.  The ALJ did not do this.

8          Finally, in finding that Dr. Matias's opinion was not supported by the record, the ALJ

9    ignored significant medical evidence in the record that was consistent with Dr. Matias's opinion.

10   Among other things, the ALJ ignored Dr. Peery's opinion that "reductions in [P.E.'s] functional

11   memory likely related to his pain, depression, and insomnia." *Id*. at 534.   Dr. Peery, like Dr.

12   Matias, diagnosed P.E. with chronic pain caused by Trigeminal Neuralgia, mild cognitive

13   impairment and adjustment disorder with mixed anxiety and depressed mood.  *Id*. at 529.  The

14   ALJ also overlooked Dr. Datta's diagnosis of mild cognitive impairment, "likely . . . related to

15   pain, medications, and . . . anxiety [and] severe depression."  *Id*. at 558.  Dr. Young also

16   concluded based on her testing that P.E. had impaired cognitive functioning.  *Id*. at 575. The ALJ

17   erred in ignoring this evidence to find that Dr. Matias's opinion was inconsistent with the medical

18   record.  *See Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001)(holding that the ALJ's

19   "specific reason for rejecting [a treating physician's medical opinion [was] not supported by

20   substantial evidence" by "selectively rel[ying] on some entries in [the claimant's] records ... and

21   ignor[ing] the many others that indicated continued, severe impairment.").

22         The fact that Dr. Matias's opinion was offered in the context of P.E.'s application for

23   citizenship also is not a sufficient reason for discounting Dr. Matias's opinion.  While it is true that

24   the USCIS Form was submitted to a different agency in support of his application to be excused

25   from the English language and U.S. history and civics requirements for U.S. citizenship – and not

26   to establish that he was disabled under the Social Security Act – the ALJ does not explain why this

27   has any bearing on the objective medical evidence offered by Dr. Matias in the USCIS Form.  An

28   ALJ may not simply ignore medical evidence, even if it is submitted to another agency for another

United States District Court
Northern District of California

30

purpose, without providing some reasonable basis for concluding that it is entitled to less weight because of the context in which it was offered.  *See Gonzalez v. Commissioner of SSA*, Case No. 16-cv-5310 KAW, 2018 WL 1426655, at *7 (N.D. Cal. 2018) ("Simply because medical evidence was derived from a worker's compensation proceeding does not mean the ALJ is not required to review that medical evidence and explain why such evidence should be afforded particular weight.");  *Ray v. Saul*, No. 2:18-CV-0561 DB, 2019 WL 3767454, at *3 (E.D. Cal. Aug. 9, 2019) ("'the ALJ should evaluate the objective medical findings set forth in the medical reports for submission with the worker's compensation claim by the same standards that s/he uses to evaluate medical findings in reports made in the first instance for the Social Security claim, unless there is some reasonable basis to believe a particular report or finding is not entitled to comparable weight.'") (quoting *Coria v. Heckler*, 750 F.2d 245, 248 (3rd Cir. 1984)).

In sum, the ALJ erred by failing to provide specific and legitimate reasons based on substantial evidence for discounting Dr. Matias's opinion.

### 3.  The ALJ Did Not Provide Specific and Legitimate Reasons to Reject Part of Dr. Young's Opinion

The ALJ gave "great weight" to the majority of Dr. Young's opinion but "little weight" to her opinion that P.E. would require special supervision at work, finding that "[t]his part of the opinion is not explained and does not tie back to any of the findings in the mental status exam." AR at 30.  This is not a specific and legitimate reason for rejecting Dr. Young's opinion and it is not supported by substantial evidence.

The ALJ may reject the opinion of any physician "if that opinion is brief, conclusory, and inadequately supported by clinical findings."  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citing *Matney v. Sullivan*,, 981 F.2d 1015, 1019 (9th Cir. 1992)).  Here, however, the ALJ looked only to the results of Dr. Young's mental status exam and did not address the other grounds for her opinion, namely, the results of the test she conducted of P.E.'s intellectual functioning (which found him in the < 1 percentile range), P.E.'s report to her that he was "forgetful" and her review of P.E.'s Adult Function Report.   P.E.'s Adult Function Report described the need for supervision in his daily life with respect to numerous activities, including

taking long drives (he needed to be accompanied because he got confused about directions), grocery shopping (he could accompany his wife but could not be entrusted to do the grocery shopping on his own because he bought the wrong things), going places (other than going on daily walks around the block, his wife was always with him), and following instructions (he needed verbal instructions and needed repetition of instructions because he forgot them.). *See id.* at 249-257. As discussed below, the ALJ did not give adequate reasons for declining to credit P.E.'s report of his limitations and symptoms in his Adult Function Report. Likewise, he offered no explanation for why he looked only to Dr. Young's mental status exam in finding that her conclusion with respect to the need for supervision was not supported by the record. As her conclusion that P.E. needed special supervision clearly tied back to the evidence discussed above of low intellectual functioning, poor memory, and inability to function independently with respect to many daily activities, the ALJ's conclusion was not a specific and legitimate reason for rejecting this limitation and was not supported by substantial evidence.

### 4. The ALJ Improperly Gave Great Weight to the Opinions of Nonexamining Physicians

The ALJ gave "great weight" the opinions of state agency medical reviewers Dr. Eskander and Dr. Acinas that P.E.'s trigeminal neuralgia was "controlled by medication" and P.E.'s only nonexertional limitations should be to avoid concentrated exposure to cold or heat, or to noise and vibration, finding that their opinions were "consistent with and supported by the record as a whole" and pointing to the fact that these doctors had experience with Social Security disability determinations. *Id*. at 30. P.E. contends that the two reasons the ALJ provided for relying heavily on the opinions of these non-examining physicians are not specific and legitimate or supported by substantial evidence in the record. The Court agrees.

First, the nonexamining physicians' findings that P.E.'s trigeminal neuralgia was controlled by medication ignores the extensive evidence in the record, mostly from doctors who treated P.E., that although his pain ebbed and flowed, P.E. continued to experience significant pain as a result of his trigeminal neuralgia, despite participating in a pain management program at Kaiser, undergoing acupuncture, and numerous changes in his medications. *See, e.g.,* AR at 403

United States District Court
Northern District of California

(Dr. Efron describes trigeminal neuralgia as "medically refractory" in 2010);  461-511 (summary by Chronic Pain Management Physician Dr. Hsu of P.E.'s history of chronic pain and medication changes and treatment notes from July through December 2015 documenting numerous trials to adjust medications and P.E.'s ongoing chronic pain);  337 (Dr. Meza's treatment note dated March 24, 2013 that P.E. was having "breakthrough pain" despite being on carbamazepine and that he was unable to go to work);  422-426 (records showing that P.E. underwent a series of acupuncture sessions aimed at alleviating his pain);  411 (Dr. Meza's treatment note dated May 22, 2015, noting that P.E. was "[f]rustrated about his trigeminal neuralgia – states that it affects him psychologically, it makes him depressed[.]  Upset and unable to carry on his ADL's." );  411 (June 12, 2015 treatment note by Dr. Jelalian noting that  P.E. reported he was feeling a sharp, persistent, worsening pain);  529 (note from Peery's 2017 report that P.E. reported pain "as great as 10/10 for 3 or more attacks per day; each attack lasts 5-15 minutes before subsiding."); 476 (2015 report by Dr. Young noting that P.E. reported "suicidal ideation related to strong pain and diagnosing  "Adjustment Disorder with Mixed Anxiety and Depressed Mood" and  "[Rule Out] Mood Disorder due to Pain" and "[Rule Out] Cognitive Disorder NOS.");   493 (October 19, 2015 treatment note by M.F.T. Moore that P.E. had experienced "no change or improvement" since starting the pain management program and was "still very frustrated.");  569-570 (June 23, 2016 treatment note by Dr. Meza that tramadol was no longer effective and  prescribing hydrocodone–acetaminophen (Norco) to treat P.E.'s pain).

Moreover, doctors who examined or treated P.E. found that his pain contributed to his anxiety and depression, which caused additional symptoms related to P.E.'s ability to function such as difficulty concentrating and remembering things.  *See, e.g., id.* at 558 (November 9, 2016 treatment note by Dr. Datta diagnosing P.E. with mild cognitive impairment "likely . . . related to pain, medications, and . . . anxiety [and] severe depression." );  409 (June 2, 2015 treatment note by Dr. Matias noting that  P.E. had experienced suicidal ideation about a month before, "triggered by strong pain."); 602 (USCIS Form by Dr. Matias listing P.E.'s diagnoses as "Mild Neurocognitive Disorder;" "Major Depressive Disorder;" and "Chronic Pain . . . due to medically Refractory Trigeminal Neuralgia.").

1    The ALJ does not explain why the state agency physicians, who conducted only a review

2    of P.E.'s medical records, were in a better position to evaluate P.E.'s non-exertional limitations or

3    why their opinion that P.E.'s pain was controlled by medication was entitled to greater weight than

4    the opinions and treatment records of P.E.'s medical providers pointing to the opposite conclusion.

5    Further, the ALJ does not explain why the familiarity of these doctors with social security

6    disability determinations justifies giving greater weight to their opinions than to the opinions of

7    the doctors who treated and examined him.    Therefore, the Court concludes that the ALJ erred in

8    adopting the opinions of Drs. Eskander and Acinas by failing to provide specific and legitimate

9    reasons supported by substantial evidence for doing so.

**C.    Whether the ALJ Provided Clear and Convincing Reasons to Reject P.E.'s Testimony**

**1.    Legal Standards Governing Claimant Credibility Determinations**

"The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).  In assessing credibility, the ALJ must first determine "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  Then, if there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d at 128.  These reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (internal quotation marks omitted).   "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), as amended (Apr. 9, 1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir.1993); *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir.1988)).

United States District Court
Northern District of California

### 2. Discussion

In his Adult Function Report and at the hearing, P.E. offered testimony about the severity and effects of his chronic pain, which included his depression and thoughts of suicide when experiencing pain flares, self-isolation, increased anxiety in response to stress, difficulty finishing things, inability to perform simple tasks, such as grocery shopping, problems understanding and remembering instructions, and a need to be accompanied to doctors' appointments and when driving more than a short distance due to confusion. The ALJ found as a general matter that P.E.'s testimony as to the severity of his symptoms was not credible, but the only specific testimony he identified as not credible was P.E.'s testimony about having memory problems and that he was in pain "most of the day." *See id.* at 24, 27. The ALJ's credibility determination fell short in several respects.

First, the reason the ALJ gave for rejecting P.E.'s testimony that he was in pain most of the day was not clear and convincing. The ALJ stated that he rejected this testimony because the medical record reflected P.E.'s pain was "intermittent" but did not explain why evidence that P.E.'s pain was intermittent contradicted P.E.'s testimony. Having reviewed the hearing transcript, the Court finds that it is not. The exchange between the ALJ and P.E. regarding his daily pain reflects that P.E. (like his doctors) described it as a "jabbing pain" that occurs "many times a day," that is, intermittently. *See AR at 46-47.* As the term "intermittently" sheds no light on the *frequency* of P.E.'s pain flares, the ALJ's reason for rejecting P.E.'s testimony about the portion of his day in which he is in pain is not a clear and convincing reason for rejecting that testimony and it is not based on substantial evidence.

Second, the only reason the ALJ gave for rejecting P.E.'s testimony about his memory problems was that P.E. "appeared to have good recent and distant memory as he testified at the hearing." *Id.* at 24. The ALJ's reliance on his own observations is the sort of "sit and squirm" jurisprudence that the Ninth Circuit has rejected, at least under circumstances where, as here, the claimant's statements are supported by objective medical evidence. *See Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985). Here, Dr. Datta, a medical doctor, examined P.E. and diagnosed him with mild cognitive impairment based on his memory problems, having conducted a memory

35

1    screening test.   *Id*. at 558;   *see also id.* at 528 (note by Dr. Peery that on a memory screener,

2    P.E.'s "performance fell in the range of mild cognitive impairment.").  It was improper for the

3    ALJ, who is not a medical doctor, to rely on his own opinion of P.E's memory based on

4    observation of P.E. at the hearing when it contradicted the opinion of these medical professionals.

5         Third, to the extent that the ALJ implicitly rejected P.E.'s testimony that he did not

6    specifically identify, he erred.  As discussed above, an ALJ must provide reasons that are

7    "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

8    claimant's testimony." *Thomas v. Barnhart*, 278 F.3d at 958. Thus, for example, the ALJ should

9    have explained why he declined to credit P.E.'s testimony that he needed a great deal of

10   supervision in his daily life, including needing to be accompanied on long drives and to doctor

11   appointments, among other things.  This testimony mirrors that of his wife and is supported by Dr.

12   Young's opinion (which the ALJ also rejected improperly) yet the ALJ did not explain why he did

13   not find it credible.

14        Fourth, the reasons the ALJ did offer for finding generally that P.E.s testimony was not

15   fully credible are inadequate.  The ALJ relied heavily on the fact that P.E.'s diagnoses predate his

16   alleged onset date of June 28, 2013, when P.E. stopped working, and that he stopped working

17   because his job no longer offered benefits and not due to the severity of his symptoms.  As the

18   ALJ recognized, however, P.E. could qualify for disability so long as he demonstrated that he was

19   disabled on or before his date last insured of December 31, 2018.  Therefore, to the extent the ALJ

20   relied on evidence and testimony showing that P.E. was able to work in 2013, this is not a clear

21   and convincing reason for rejecting his symptom testimony in his July 2015 Adult Function

22   Report and at the June 2017 hearing.

23        Nor does the ALJ's reliance on P.E.'s "conservative" treatment, use of medication, and

24   MRI and CT scan results meet this requirement.  As to the MRI and CT scan results, it is well-

25   established that "the Commissioner may not discredit the claimant's testimony as to the severity of

26   symptoms merely because they are unsupported by objective medical evidence." *Reddick v.*

27   *Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  Further, the ALJ's apparent conclusion that P.E.'s pain

28   was well-controlled by medication is based on a highly selective reading of the record.   As

United States District Court
Northern District of California

36

discussed above, the ALJ ignored the extensive evidence in the record that although P.E.'s pain ebbed and flowed, he continued to experience significant pain as a result of his trigeminal neuralgia, as well as related anxiety and depression, despite participating in a pain management program at Kaiser, undergoing acupuncture, and making numerous changes in his medications. There is also evidence in the record that P.E.'s pain worsened in 2015.

With respect to the ALJ's reliance on P.E.'s conservative treatment, the ALJ also erred.  In the Ninth Circuit, "an unexplained, or inadequately explained, failure to seek treatment may be the basis for an adverse credibility finding *unless* one of a number of good reasons for not doing so applies." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (internal quotation and citation omitted) (emphasis added).   The record indicates that P.E. was reluctant to seek and continue treatment both for his pain management and his mental health because of the language barrier between him and his healthcare providers. *See* AR at 497 ("Wife explained that every time appointment is booked with booked with Tim [Moore, M.F.T.] husband decides to cancel the day before.  He has expressed to her that no one understands how he feels due to the language barrier."); 530 ("[P.E.] declined to participate in psychotherapy with anyone who does not speak Spanish, owing to frustration about not being understood.").  The record also indicates that P.E. had financial difficulties and lost his work-related benefits in 2013. *Id*. at 474 (noting that P.E. "quit as the new company took over and no longer provided employee benefits."); 519 (noting that P.E.'s main stressor was financial).  "Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir.1995).  The ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to seek medical treatment." S.S.R. 96–7p at 7–8.  The ALJ did not ask P.E. why he delayed seeking treatment even though the record suggests that P.E. may have deferred treatment for reasons other than the nonseverity of his condition.  The ALJ also did not ask P.E. at the hearing why he declined surgery for his trigeminal neuralgia.  For this reason, the Court finds the ALJ's reliance on P.E.'s "conservative" treatment is not convincing.

37

United States District Court
Northern District of California

1    The Court also rejects the ALJ's reliance on the fact that P.E. had not been hospitalized or

2   exhibited "imminent" suicidal ideation to support his finding of conservative treatment. Courts in

3   this circuit have found that psychiatric hospitalization is not a benchmark for conservative

4   treatment. *See Morales v. Berryhill*, 239 F. Supp. 3d 1211, 1216 (E.D. Cal. 2017) ("A claimant

5   may suffer from mental health impairments that prevent him from working but do not require

6   psychiatric hospitalization."). P.E.'s doctors unanimously agreed that his anxiety and depression

7   were triggered by his chronic pain associated with his trigeminal neuralgia, and P.E. took

8   numerous medications to address that condition, which persisted nonetheless. Consequently, the

9   fact that P.E. was not hospitalized for his mental impairments and did not experience "imminent"

10  suicidal ideation is not a clear and convincing reason for discrediting his symptom testimony

11  regarding his mental impairment. *See Callahan v. Berryhill*, No. EDCV 17-1247-KS, 2018 WL

12  2446649, at *4 (C.D. Cal. May 29, 2018) (holding that the ALJ had erred in finding the claimant's

13  treatment was conservative because there was no evidence of counseling sessions or

14  hospitalization where the record showed that the claimant had been prescribed several psychiatric

15  medications and still experienced mood swings).

16    Finally, the ALJ's finding that P.E.'s testimony was not credible because "[h]is thought

17  process, thought content, attention, concentration, memory, fund of knowledge, impulse control,

18  insight and judgment were noted to be within normal limits when he sought mental health care in

19  2015," AR at 27, is not a clear and convincing reason for rejecting his testimony. Again, the ALJ

20  has cherry-picked the record, ignoring medical evidence that does not support his conclusion. Dr.

21  Matias diagnosed P.E. with "Adjustment Disorder with mixed anxiety and depressed mood" on

22  June 2, 2015, assigning a GAF score of 41-50, signifying "serious symptoms." *Id.* at 404, 409.

23  On July 9, 2015, M.F.T. Moore found that P.E. had "severe depressive symptoms" and that his

24  affect was "blunted but showed some range." *Id.* at 520. In 2017, Dr. Peery noted that P.E.

25  "meets the diagnostic criteria for Major Depressive Disorder, and he is at moderate risk for

26  suicide," and that therapy did not seem to improve his symptoms. *Id.* at 532. Finally, between

27  December of 2015 and June of 2017, P.E.'s medical providers repeatedly described P.E.'s mood

28  as "depressed" or "anxious." *Id.* at 635, 641, 655, 661, 665, 669, 674, 683, 688, 700, 708, 723,

1    742.

2         For these reasons the Court finds that the ALJ did not provide specific, clear and

3    convincing reasons for declining to fully credit P.E.'s testimony about his symptoms.

4    **D.    Whether the ALJ Gave Germane Reasons for Rejecting M.E.'s Testimony**

5         The ALJ further erred when he failed to provide sufficient reasons for finding M.E.'s

6    testimony not credible.  "Lay testimony as to a claimant's symptoms is competent evidence that an

7    ALJ must take into account, unless he or she expressly determines to disregard such testimony and

8    gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir.

9    2001) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996) (internal citation omitted)).

10   The ALJ gave two reasons for rejecting M.E.'s testimony: 1) M.E. is not a medical source familiar

11   with the Social Security Administration's disability determination process; and 2) M.E. repeated

12   many of P.E.'s statements, which the ALJ found inconsistent with the record.  AR at 29.  Neither

13   of these reasons is "germane."

14        First, to the extent the ALJ discounted M.E.'s statements because she was not an

15   "acceptable medical source," the ALJ misunderstood the role of lay testimony in the disability

16   determination.  While "medical diagnoses are beyond the competence of lay witnesses and

17   therefore do not constitute competent evidence, . . . lay testimony as to a claimant's symptoms or

18   how an impairment affects ability to work *is* competent evidence." *Nguyen v. Chater*, 100 F.3d at

19   1467; *see also Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (holding that a "lay person . .

20   . though not a vocational or medical expert, was not disqualified from rendering an opinion as to

21   how [the claimant's] condition affects [her] ability to perform basic work activities.") (citing 20

22   C.F.R. § 404.1513(d)(4)).  M.E. offered her testimony not as a medical provider or an expert on

23   social security disability determinations but rather based on her observations of her husband's

24   symptoms as they affect his ability to function in his daily life.  These observations are competent

25   evidence; the ALJ erred when he discounted M.E.'s testimony on this ground.

26        The ALJ's rejection of M.E.'s testimony on the ground that it was "largely duplicative" of

27   P.E.'s testimony was also error.  As discussed above, the ALJ's credibility analysis with respect to

28   P.E.'s testimony was flawed in numerous respects.  To the extent that he offers those same reasons

United States District Court
Northern District of California

39

United States District Court
Northern District of California

1  for rejecting M.E.'s testimony, they are also inadequate.

3  ### E.   Whether the RFC and Resulting VE Hypothetical Adequately Captured P.E.'s Limitations

4  The only nonexertional limitations the ALJ included in P.E.'s RFC were limitations to: 1)
5  "performing simple, routine tasks;" and 2)  "making simple work-related decisions."  AR at 25.
6  P.E. argues that the ALJ erred with respect to his RFC – and the hypothetical he posed to the VE
7  based on that RFC – because it did not address the evidence in the record relating to the likely
8  impact his chronic pain would have on his ability to work.   The Court agrees.

9  Pain is a nonexertional impairment when it does not affect the claimant's strength but
10  affects him in other ways that limit a claimant's ability to work, such as the ability to focus,
11  understand instructions or function without supervision.  *See Desrosiers v. Secretary of Health*
12  *and Human Services*, 846 F.2d 573, 579 (9th Cir.1988).   Further, "[t]he hypothetical an ALJ
13  poses to a vocational expert, which derives from the RFC, 'must set out all the limitations and
14  restrictions of the particular claimant.'"   *Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 690
15  (9th Cir. 2009) (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).   As discussed
16  above, the ALJ failed to offer adequate reasons for rejecting P.E. and M.E.'s testimony regarding
17  the limitations on his ability to function due to chronic pain and improperly weighed the opinions
18  of P.E.'s medical providers with respect to the symptoms associated with his chronic pain.
19  Therefore, the Court finds that the ALJ's RFC was not supported by substantial evidence and that
20  the hypothetical posed to the VE did not accurately reflect P.E.'s nonexertional limitations.  *See*
21  *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 886 (9th Cir. 2006) (An "ALJ's failure to account for
22  the testimony of [the claimant and lay witnesses] calls into question the validity of his [RFC
23  determination] . . . . Because those determinations were flawed, the hypothetical posed to the
24  vocational expert was legally inadequate.")  (citing *Osenbrock v. Apfel*, 240 F.3d 1157, 1163–65
25  (9th Cir. 2001)).

27  ### F.   Remedy
"A district court may affirm, modify, or reverse a decision by the Commissioner 'with or

40

1   without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir.

2   2014) (quoting 42 U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy

3   defects in the original administrative proceeding, a social security case should be remanded."

4   *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  Here, the Court finds that further

5   proceedings are necessary to address the ALJ's errors with respect to his weighing of the medical

6   evidence and consideration of the testimony of P.E. and M.E. The Commissioner should

7   reevaluate P.E.'s limitations to determine whether his impairments meet or equals a listing at step

8   three; if they do not, the Commissioner should determine P.E.'s RFC under correct legal standards

9   and whether there is work available in the national economy that P.E. can perform in light of that

10  RFC.

## IV.   CONCLUSION

For the reasons stated above, P.E.'s motion is GRANTED, the Commissioner's motion is

DENIED and the matter is REMANDED to the Commissioner for further proceedings consistent

with this Order. The Clerk is instructed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated: April 17, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

41